1

2

3

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Mar 17, 2023

SEAN F. McAVOY, CLERK

4

5

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

6

7

8

9

10

11

12

ROBERT R.,[1]

                Plaintiff,

      v.

KILOLO KIJAKAZI, Acting
Commissioner of Social Security,

              Defendant.

No.   2:21-cv-0340-EFS

**ORDER GRANTING PLAINTIFF'S
SUMMARY-JUDGMENT MOTION,
DENYING DEFENDANT'S
SUMMARY-JUDGMENT MOTION,
AND REMANDING FOR FURTHER
PROCEEDINGS**

13

14

15

16

17

18

19

20

21

22

23

Plaintiff Robert R. appeals the denial of benefits by the Administrative Law

Judge (ALJ).  Because substantial evidence does not support the ALJ's

interpretation of key medical evidence, the Court reverses the ALJ's decision and

remands this matter for further proceedings.

///

//

/

---

[1] For privacy reasons, Plaintiff is referred to by first name and last initial or as
"Plaintiff."  *See* LCivR 5.2(c).

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 1

## I.  Five-Step Disability Determination

A five-step evaluation determines whether a claimant is disabled.[2]  Step one assesses whether the claimant is engaged in substantial gainful activity.[3]  Step two assesses whether the claimant has a medically severe impairment or combination of impairments that significantly limit the claimant's physical or mental ability to do basic work activities.[4]  Step three compares the claimant's impairment or combination of impairments to several recognized by the Commissioner to be so severe as to preclude substantial gainful activity.[5]  Step four assesses whether an impairment prevents the claimant from performing work he performed in the past by determining the claimant's residual functional capacity (RFC).[6]  Step five assesses whether the claimant can perform other substantial gainful work—work that exists in significant numbers in the national economy—considering the claimant's RFC, age, education, and work experience.[7]

---

[2] 20 C.F.R. § 404.1520(a).

[3] *Id.* § 404.1520(a)(4)(i), (b).

[4] *Id.* § 404.1520(a)(4)(ii), (c).

[5] *Id.* § 404.1520(a)(4)(iii), (d).

[6] *Id.* § 404.1520(a)(4)(iv).

[7] *Id.* § 404.1520(a)(4)(v), (g).

## II.    Background

At issue is Plaintiff's application for disability benefits under Title 2.  This is not the first time Plaintiff applied for Title-2 disability benefits.

### 1.    Prior Unfavorable Decision

Plaintiff previously applied for disability benefits in 2016.  In June 2018, an ALJ issued a decision assessing Plaintiff with the severe impairments of seizure disorder, asthma, and COPD, but finding he could nonetheless perform past relevant work as a contract administrator, production superintendent, and project director.[8]  Plaintiff appealed the unfavorable decision.  In October 2019, the District Court for the Western District of Washington affirmed the June 2018 decision, making it administratively final.[9]

### 2.    Plaintiff's Current Application

In June 2019, while his appeal was still pending, Plaintiff filed a new application for benefits under Title 2, claiming disability based on back injury, chronic pain, epilepsy, depression, anxiety, bilateral shoulder condition/pain, tricompartmental osteoarthritis of right knee, chronic obstructive pulmonary disease (COPD), forgetfulness, and memory loss.[10]  Plaintiff initially alleged an

---

[8] AR 128–39.

[9] AR 156–66. *See also* AR 16.

[10] *See* AR 371.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 3

onset date of November 11, 2015.[11]  After the June 2018 decision became final, however, Plaintiff amended his onset date to July 1, 2018.[12]  The agency denied his current application initially and on reconsideration,[13] and Plaintiff requested a hearing before an ALJ.

### 3.    ALJ Hearings & Plaintiff's Symptom Reports

In November 2020, ALJ Lori L. Freund held a telephonic hearing at which medical expert Stephen Andersen, MD, Plaintiff, and Plaintiff's wife presented testimony.[14]  Then, in March 2021, the ALJ held a supplemental hearing by telephone, receiving testimony from medical expert Ricardo Buitrago, PsyD, Plaintiff, Plaintiff's wife, and a vocational expert.[15]

Through their testimony, as well as through function reports and questionnaires, Plaintiff and his wife described the symptoms of what Plaintiff called his "grand mal seizures."[16]  The larger seizures involved prolonged,

---

[11] AR 367.

[12] AR 51–52.

[13] AR 168–83 (initial denial); AR 184–98 (denial on reconsideration).

[14] AR 47–86.

[15] AR 87–124.

[16] *See* AR 72, 74–75, 80–81 (Nov. 2020 hearing); AR 102, 104–07 (March 2021 supplemental hearing); AR 408–31 (Aug. 2019 function reports and seizure questionnaires).

sometimes violent, shaking and could result in loss of consciousness, loss of bladder control, and injury.[17]  Plaintiff indicated the larger seizures occurred only occasionally but that when they did occur, they left him "[a]bsolutely, totally, totally exhausted," and they sometimes required hospitalization.[18]

Plaintiff and his wife also described what Plaintiff called his "small petit mal seizures" (hereinafter referred to as "spells").[19]  Plaintiff reported these smaller, seizure-like spells, occurred approximately 20 times per day, and he said, "I lose consciousness very brief, so brief I could be holding a conversation with somebody, have one and . . . I know that within a blink that I've had one and lost consciousness for that moment, and unless somebody knows, they would not know that I had one."[20]  Plaintiff testified, "[I]f I resume a conversation with somebody . . . I act as though nothing has happened, although I forget completely the content of our conversation and what is going on . . . ."[21]  And Plaintiff explained that when this occurred, he would "try and assess" what had transpired based on context.

---

[17] *See* AR 417, 421–22.

[18] *See* AR 72, 74–75, 80–81 (Nov. 2020 hearing); AR 102, 104–07 (March 2021 supplemental hearing); AR 121–22 (Aug. 2019 seizures questionnaire filled out by Plaintiff's wife); AR 424–31 (Aug. 2019 function report filled out by Plaintiff's wife).

[19] *See* AR 72, 74–75, 80–81, 102, 104–07, 408–31.

[20] AR 74–75.

[21] AR 102.

Plaintiff's wife added that she has observed Plaintiff's spells, where "it looks like he kind of spaces off . . . and has little jerky motions, and then afterwards, . . . he's tired.  He's kind of like disoriented and out of it and usually tired."[22]  She testified that Plaintiff's smaller spells "happen pretty frequently" and that she believed his memory to be compromised, saying, "he just doesn't remember anything."[23]  Overall, Plaintiff's wife reported that his seizures left him "[c]onfused a lot of the time, forgetful, tired, [and] cranky."[24]

### 4.  **The ALJ's Decision**

In April 2021, the ALJ issued a written decision again denying Plaintiff's disability application.[25]  As to the sequential disability analysis, the ALJ found:

- Plaintiff met the insured status requirements through June 30, 2019.

- Step one: Plaintiff had not engaged in substantial gainful activity from the amended alleged onset date of July 1, 2018, through the date last insured of June 30, 2019.[26]

//

/

---

[22] AR 105–06.

[23] AR 80–81.

[24] AR 422.

[25] AR 15–28.

[26] AR 18.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 6

- Step two: Plaintiff had the following medically determinable severe impairments: psychogenic non-epileptic seizures, asthma, COPD, degenerative joint disease of the left shoulder, and anterior cruciate ligament (ACL) tear of the right knee, status post-surgical repair.

- Step three: Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.

- RFC: During the relevant period, Plaintiff had the RFC to perform light work limited to jobs involving:

  o lifting up to 20 pounds occasionally and up to 10 pounds frequently;
  o standing and walking for up to 4 hours total in an 8-hour workday with normal breaks;
  o sitting for at least 6 hours in an 8-hour workday with normal breaks;
  o never climbing ladders, ropes, or scaffolds;
  o only occasionally stooping, kneeling, crouching, crawling, climbing ramps and stairs, and balancing;
  o only occasionally reaching overhead bilaterally;
  o only occasionally pushing and pulling with the upper extremities;
  o avoiding concentrated exposure to extreme cold and humidity;
  o avoiding even moderate exposure to airborne particulates such as fumes, odors, dust, et cetera and hazards;
  o avoiding all unprotected heights; and
  o avoiding the operational control of moving machinery.[27]

---

[27] AR 21–22.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 7

- Step four: Plaintiff—through the date last insured—was capable of performing past relevant work as a contract administrator, production superintendent, and project director.

- Step five: in addition to the above past relevant work, considering Plaintiff's RFC, age, education, and work history, Plaintiff could perform work that existed in significant numbers in the national economy, such as parking lot attendant, toll bridge attendant, and garment sorter.

In reaching her decision, the ALJ found the medical opinions of the testifying medical experts, Dr. Andersen and Dr. Buitrago, to be very persuasive. She also found the prior administrative medical findings persuasive. However, the ALJ found a February 2018 medical opinion by Plaintiff's treating provider, Ryan McMeans, PA-C, as well as a February 2021 letter from Plaintiff's treating counselor, Kelly Norman, MA, to be unpersuasive.

The ALJ found Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, but that his statements concerning the intensity, persistence, and limiting effects of those symptoms were "not entirely consistent with the medical evidence and other evidence in the record."[28]

Plaintiff requested review of the ALJ's decision by the Appeals Council, which denied review.  Plaintiff then appealed to this Court.

---

[28] AR 23.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 8

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

### III.    Standard of Review

A district court's review of the Commissioner's final decision is limited.[29] The Commissioner's decision is set aside "only if it is not supported by substantial evidence or is based on legal error."[30]  Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[31]  Because it is the role of the ALJ to weight conflicting evidence, the Court upholds the ALJ's findings "if they are supported by inferences reasonably drawn from the record."[32]  Further, the Court may not reverse an ALJ decision due to a harmless error—one that "is inconsequential to the ultimate nondisability determination."[33]

---

[29] 42 U.S.C. § 405(g).

[30] *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012).

[31] *Id.* at 1159 (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)).

[32] *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012). *See also Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (The court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion," not simply the evidence cited by the ALJ or the parties.) (cleaned up); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered[.]").

[33] *Molina*, 674 F.3d at 1115 (cleaned up).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

### IV.    Analysis

Plaintiff argues that the ALJ (1) failed to properly apply *Chavez* and res judicata, (2) improperly evaluated the medical evidence, (3) improperly discounted Plaintiff's symptom reports, and (4) improperly rejected his wife's testimony.[34] Plaintiff contends that without these errors, his RFC would have included additional limitations related to his fatigue, forgetfulness, need to take extra breaks, and likely rate of absenteeism.  For the reasons discussed below, the Court holds the ALJ reversibly erred by failing to adequately address Plaintiff's seizures/spells and the symptoms and limitations related thereto.

**A.    Res Judicata (*Chavez*): Plaintiff fails to show consequential error.**

As an initial matter, Plaintiff argues that the ALJ improperly applied res judicata under *Chavez v. Bowen*, 844 F.2d 691 (9th Cir. 1988), and AR 97-4(9).[35]

### 1.    Legal Standard & Analysis

In *Chavez*, [the Ninth Circuit] observed that principles of res judicata apply to administrative decisions regarding disability and impose an obligation on the claimant, in instances where a prior ALJ has made a finding of non-disability, to come forward with evidence of "changed circumstances" in order to overcome a presumption of continuing non-disability.  [The court] also explained that a previous ALJ's findings concerning residual functional capacity, education, and work experience are entitled to some res judicata consideration and such findings cannot be reconsidered by a subsequent judge absent new information not presented to the first judge.[36]

---

[34] *See generally* ECF No. 15.

[35] ECF No. 15 at 6–7.

[36] *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1173 (9th Cir. 2008) (cleaned up).

1    Here, the ALJ expressly found there to be "changed circumstances that

2  rebut the *Chavez* presumption of continuing non-disability."[37]  Even after this

3  initial rebuttal, however, the prior decision was still entitled to "some res judicata

4  consideration."[38]  In such circumstances, an ALJ is still required to give effect to

5  certain prior findings—including those of the claimant's RFC, education, work

6  experience, or "other finding required at a step in the sequential evaluation

7  process"—*unless* there is new and material evidence relating to such a finding or

8  there has been a change in the law, regulations or rulings affecting the finding or

9  the method for arriving at the finding."[39]

10    **2.    Legal Error**

11    The Court agrees with Plaintiff that the ALJ legally erred to the extent she

12  relied on *Chavez* to "adopt[] the prior decision finding of the claimant having only

13  non-severe mental impairments based on there being no new and material

14  evidence as to the claimant's mental functioning."[40]  As Plaintiff points out, not

15  only did the record contain new evidence regarding his mental-health impairments,

16  but there were also subsequent revisions to the medical-evidence regulations that

---

[37] AR 16.

[38] *See Chavez*, 844 F.2d at 694.

[39] Acquiescence Ruling 97-4(9) (S.S.A. Dec. 3, 1997) 1997 WL 742758 at *3
(emphasis added).

[40] *See* AR 19 ("Pursuant to *Chavez*, the undersigned also adopts . . .").

resulted in one of Plaintiff's treating providers now being qualified as an acceptable medical source.[41] So, even if the ALJ reasonably interpreted the new evidence as not being "material," there had still been "a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding."[42]

Though the ALJ erred in this respect, the Court need not determine whether such error was consequential. As discussed below, reversal is already required for other reasons.

**B.    Evidence of Seizures/Spells: Plaintiff shows consequential error.**

In her decision, the ALJ relied extensively on the two testifying medical experts: Stephen Andersen, MD, FACEP,[43] and Ricardo Buitrago, PsyD. The ALJ tied nearly every finding to their testimony, which she repeatedly found "very persuasive."[44] Plaintiff argues that the ALJ erred in assessing the medical evidence, asserting that Dr. Andersen's and Dr. Buitrago's opinions were "lacking in consistency and supportability, as they are inconsistent with the findings and opinions of [Plaintiff]'s treatment providers, including his treating neurologists."[45] Because the only potential prejudice that Plaintiff identifies relates to fatigue,

---

[41] *See* ECF No. 15 at 6–7.

[42] Acquiescence Ruling 97-4(9) 1997 WL 742758 at *3.

[43] "FACEP" is short for Fellow of the American College of Emergency Physicians.

[44] *See* AR 18–25.

[45] ECF No. 15 at 18.

forgetfulness, a need to take extra breaks, and an increased rate of absenteeism

caused by his spells and/or larger seizures, the Court focuses on those issues.[46]

### 1.  Dr. Anderson's Testimony & Plaintiff's Medical Records

At the initial hearing in November 2020, Dr. Anderson testified in relevant

part as follows:

> Patient suffers from psychogenic non-epileptic seizures.  These have
> been worked up several times with EEG monitoring and video EEG
> monitoring and a few different neurologic consultations which all
> concluded these are nonepileptic or psychogenic seizures . . . . The
> next recent neurologic exam is talking about weaning him off of any
> seizure medication since these aren't epileptic seizures. . . . [I]n
> addition to EEGs, he's had MRI of his brain, which was
> unremarkable.[47]

Dr. Anderson then went on to reject epilepsy as a severe impairment, saying,

"Well, [Plaintiff]'s had these seizure like-activity, but now they decided after

extensive evaluation these are not epilepsy.  It's not epilepsy.  It's psychogenic."[48]

Still, Dr. Anderson acknowledged that he was "not a psychiatrist or psychologist,"

and that this kind of psychogenic seizure (i.e., Plaintiff's spells) "might be on the

---

[46] *See* ECF No. 15 at 6, 20. The Court generally limits its review to only those

issues "which are argued specifically and distinctly." *Independent Towers v.*

*Washington*, 350 F.3d 925, 929 (9th Cir. 2003); *see also Carmickle v. Comm'r of Soc.*

*Sec. Admin.*, 533 F.3d 1155, 1161 n.2 (9th Cir. 2008).

[47] AR 60.

[48] AR 65.

psychiatric or mental health listing," but that his testimony was limited to just Plaintiff's physical impairments.[49]

The very medical record that Dr. Anderson seemingly relied upon, however, clearly indicate that Plaintiff suffered from epilepsy *in addition to* non-epileptic spells.[50]  In late September 2019, after reviewing medical records that included several prior EEG studies and an MRI of Plaintiff's brain, treating neurologist Laura Lynam, MD, assessed Plaintiff with a history of "multiple types" of events.[51] She explained,

> *Larger seizures* have included loss of consciousness, fall of standing, generalized convulsion with or without tongue bite and incontinence. Early on this had included associated shoulder dislocation.  Clinically, these events would be quite consistent with generalized tonic-clonic seizure.
> . . .
> *Small spells* have been happening at a very high frequency in the long term, uncontrolled despite polytherapy with Lamictal, lorazepam, and Dilantin and including very brief lapse in awareness with a "hiccup" in breathing.  *Differential diagnosis for this particular symptom* . . . may include nonepileptic symptoms versus combination of absence and myoclonus versus a combination of both.  Video EEG monitoring . . . in March of 2018, did not definitively answer these questions . . . [but] did clearly indicate a risk for a primary generalized epilepsy based on interictal EEG findings that emerged at the end of the recording.[52]

---

[49] AR 63.

[50] *See, e.g.*, AR 804 (Aug. 2019: treating neurologist assessing Plaintiff as having non-epileptic spells, epilepsy, and depression with anxiety).

[51] AR 715–31.

[52] AR 721.

Then, in early October 2019, after completing yet another multi-day inpatient video EEG monitoring with no typical small spells or larger seizures observed, neurologist Laura Hershkowitz, DO, similarly listed Plaintiff's final diagnoses on discharge as including "Generalized epilepsy without intractable epilepsy" *and* "Convulsions, not otherwise specified."[53]  Indeed, going back to March 2018, Plaintiff's examining and treating neurologists had consistently distinguished between his larger seizures, which—based on the EEG results—"likely reflect[ed] the presence of an underlying primary generalized epilepsy," and Plaintiff's smaller spells, which were found to be "most likely nonepileptic in nature."[54]

---

[53] AR 728.

[54] *See, e.g.*, AR 504–05 (Mar. 2018); AR 623 (Aug. 2018); AR 626 (Dec. 2018); AR 631 (March 2019); AR 804 (Aug. 2019). *See also* AR (Sept. 2019: Plaintiff presenting to the emergency department for "seizure-like episode"; "He had another brief seizure-like episode witnessed by EMS personnel, which was characterized by unresponsiveness, tilting back of the head, generalized increased muscle tone, and brief twitching motions, and lasted a few seconds."  "EMS states the patient was then combative and agitated but was eventually calmer and compliant after his wife convinced him he needed to visit the emergency department.  On initial EMS exam, the patient was noted to have generalized weakness in the bilateral upper and lower extremities.").

Dr. Andersen was seemingly under the impression that the most recent testing indicated *all* of Plaintiff's seizure-like symptoms were psychogenic in nature.  Such a conclusion is not supported by the longitudinal record.  And Dr. Andersen gave no testimony regarding epileptic seizures generally or the difference between epileptic seizures versus nonepileptic, psychogenic spells.

### 2.  **Dr. Buitrago's Testimony**

At the March 2021 supplemental hearing, Dr. Buitrago testified that the mental-health records he reviewed from the relevant period "generally have [Plaintiff's] mental status as consistently within normal limits."[55]  Dr. Buitrago therefore opined that Plaintiff had no functional limitations under the Paragraph B criteria.[56]  When asked whether he saw treatment notes indicating Plaintiff was experiencing "seizure-like episodes" between 10–30 times per day, Dr. Buitrago said,

> I noted a generalized epilepsy diagnosis.  I did note that he had a seizure disorder.  I'm not sure how many he was experiencing, but what I look at is as a result of his seizures how it's affecting his mental health functioning, so I'm not a medical doctor to assess for the actual effects of the seizure, h[is] actual seizures.  I'm just looking mental health[-]wise how he is being affected.[57]

---

[55] AR 99; *see also* AR 100.

[56] AR 96.  Importantly, Paragraph B findings do not amount to a RFC assessment, which requires a more detailed analysis.

[57] AR 97–98.

1    Dr. Buitrago explained that although he had reviewed at least some of the

2    treatment records created after the last date insured, he "didn't take any notes

3    conceptualized from thereafter because the hearing notice only told [him] to go

4    through June 30, 2019."[58]  This—along with the fact that Dr. Buitrago noted a

5    diagnosis for "generalized epilepsy" but omitted any diagnosis for psychogenic,

6    nonepileptic spells—suggest that Dr. Buitrago failed to account for the distinction

7    between Plaintiff's larger, apparently epileptic seizures and his psychogenic spells.

8    When asked to assume that someone like Plaintiff was experiencing

9    psychogenic, "petit mal-like episodes" 10–20 times per day, Dr. Buitrago opined

10    that these small spells could theoretically interfere with a person's ability to

11    maintain attention and concentration, but that in Plaintiff's case, he "didn't see

12    that in any of the records [he] reviewed."[59]  Even so, Dr. Buitrago was not asked

13    about, and gave no testimony regarding, psychogenic seizures generally or their

14    potential symptoms, causes, or treatments.  Nor did Dr. Buitrago indicate whether

15    the evidence of record was consistent with psychogenic seizures.  Finally,

16    Dr. Buitrago did not offer any opinion as to whether psychogenic seizures could

17

18

19

---

20    [58] AR 97.

21    [59] AR 98; *see also* AR 99 ("[T]he mental records that I reviewed generally have his

22    mental status as consistently within normal limits[.]").

23

1    reasonably be expected to cause Plaintiff's alleged symptoms—specifically,

2    fatigue.[60]

3        **3.    The ALJ's Findings & Consequential Error**

4        Relying on the medical-expert testimony, the ALJ found "the claimant's

5    seizure disorder consisted of psychogenic non-epileptic seizures," and she therefore

6    found Plaintiff "has shown no medically determinable impairment of epilepsy."[61]

7    As discussed above, however, the neurologists of record were apparently in

8    _____

9

10   [60] Though Dr. Buitrago did not indicate whether normal mental-status exams were

11   inherently inconsistent with someone suffering from psychogenic seizures, the ALJ

12   could have reasonably interpreted Dr. Buitrago's testimony as indicating that such

13   normal exams were inconsistent with Plaintiff's specific claims that his small spells

14   caused attention and concentration problems. *See Thomas v. Barnhart*, 278 F.3d

15   947, 954 (9th Cir. 2002) ("Where the evidence is susceptible to more than one

16   rational interpretation, one of which supports the ALJ's decision, the ALJ's

17   conclusion must be upheld.").

18   [61] *See* AR 18. In so doing, the ALJ replaced—rather than added to—the relevant

19   severe-impairment finding from the prior decision, which assessed Plaintiff with

20   "seizure disorder." *Compare* AR 18 (new decision), *with* AR 130 (prior decision). *Cf.*

21   *also* AR 23 (ALJ finding new evidence regarding Plaintiff's physical impairments

22   warranted finding "somewhat more limited postural, manipulative, and

23   environmental limitations than found in the prior decision").

agreement that Plaintiff suffered from *both* epilepsy *and* nonepileptic spells.  The ALJ's finding that Plaintiff's epilepsy did not constitute a medically determinable impairment is supported by neither sufficient explanation nor substantial evidence.  The ALJ erred at step two of the sequential evaluation.

More, the apparent conflation of Plaintiff's epilepsy and his nonepileptic spells permeated the rest of the ALJ's decision.  Throughout the sequential analysis, the ALJ repeatedly referred to her finding that Plaintiff's seizures were psychogenic and nonepileptic in nature, using it as a basis for rejecting the related limitations reported by Plaintiff and others.  This included the medical opinion of a treating provider, Ryan McMeans, PA-C, who opined that Plaintiff's seizures would, among other things, cause him to require extra breaks and would result in more than four absences in an average month of full-time work.[62]  The ALJ erred in assessing the medical evidence, including the medical opinions of record.

Other than highlighting certain normal mental-status findings that arguably contradict claims of significant focus/concentration problems, in analyzing Plaintiff's seizure/spell-related symptoms, the ALJ failed to identify which of Plaintiff's symptoms were being discounted or what evidence undermined those claims.[63]  The ALJ's decision leaves unclear whether she thought Plaintiff's seizures/spells (1) occurred less frequently than alleged, (2) did not result in the

---

[62] *See* AR 24; *see also* AR 1231 (Feb. 2018 Seizures Medical Source Statement).

[63] *See Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014).

1    thought/consciousness interruption he described, (3) were preventable/treatable,

2    (4) did not cause fatigue as alleged, or (5) a combination thereof.  Indeed, the ALJ's

3    decision makes no mention of Plaintiff's claims regarding fatigue as a symptom of

4    his seizures/spells.  The ALJ erred in discounting Plaintiff's seizure/spell-related

5    symptom reports.

6        As discussed above, the record lacks evidence describing how symptoms

7    might differ between epileptic seizures and psychogenic seizure-like spells.  As

8    such, the Court is unable to conduct a meaningful review of the ALJ's implicit

9    findings that Plaintiff's seizures/spells did not cause fatigue (or any other

10   symptoms) that would require Plaintiff to take extra rest breaks and/or result in

11   excessive absenteeism if engaged in full-time work.  Further, had such additional

12   limitations been included in Plaintiff's RFC, the vocational-expert testimony

13   indicates Plaintiff would have likely been found disabled.[64]  The ALJ's errors are

14   therefore consequential and require reversal.[65]

15

16

17   [64] *See* AR 120–21 (testifying that employers would not tolerate either a

18   requirement for unscheduled breaks every 2 hours, each lasting 15–30 minutes, or

19   absenteeism—which includes arriving late or leaving early—in excess of one day

20   per month).

21   [65] *See Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014)

22   (explaining that an error is harmless if it is inconsequential to the decision).

23

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 20

**C.      Other Assignments of Error: Not addressed.**

Reversal is already required, and the ALJ's determination that Plaintiff did not suffer from epilepsy as a medically determinable impairment likely impacted the rest of the ALJ's analysis, including her assessment of the medical evidence and Plaintiff's symptom reports.  As such, the Court need not reach Plaintiff's other assignments of error.

**D.      Remand: Further proceedings are required.**

The ALJ reversibly erred, but Plaintiff has not clearly established that he was disabled during the relevant period, and he agrees that remand for further proceedings is appropriate.[66]  On remand, the ALJ shall conduct the disability evaluation anew, beginning at step two, subject to the following additional instructions:[67]

---

[66] *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017); *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) ("[T]he proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."). *See also* ECF No. 15 at 21 (requesting remand for further proceedings).

[67] Although Plaintiff's arguments and the Courts analysis focus on Plaintiff's mental health and seizure/spell symptoms, the new evaluation is not limited to such issues, as the ALJ's reexamination of the medical-opinion evidence may impact how she views other evidence, including evidence related to Plaintiff's physical impairments.

1
2
3
4
5
6

- If the ALJ again relies on res judicata/*Chavez* to adopt a prior finding on an issue for which the record contains new, facially relevant evidence, the ALJ shall explain why such evidence is not material to the finding. Similarly, if there has been a change a law, regulation, or ruling that arguably applies, the ALJ shall explain why the change does not affect "the finding or the method for arriving at the finding."[68]

7
8
9
10
11
12
13
14
15

- If the ALJ again discounts evidence on the basis that it was generated outside the relevant period, unless made clear by context, the ALJ should explain why the timing renders the evidence less probative.  While timing is certainly a valid consideration,[69] evidence originating from before the alleged onset date and/or after the date last insured can still be highly probative of a claimant's condition during the relevant period— particularly when it comes to a longstanding impairment that, due to its nature, is unlikely to exhibit a sudden and sustained change in symptoms.[70]

16
17

- With respect to the medical-opinion evidence, the ALJ must meaningfully articulate the supportability and consistency of each medical opinion.

18
19
20
21
22
23

---

[68] *See* Acquiescence Ruling 97-4(9) 1997 WL 742758 at \*3.

[69] *See Carmickle*, 533 F.3d at 1165.

[70] *Cf. Fair v. Bowen*, 885 F.2d 597, 600 (9th Cir. 1989) (noting old evidence was probative as to whether the claimant's condition had worsened over time).

- If the ALJ again rejects epilepsy (or a similar seizure-related disorder) as a medically determinable impairment, the ALJ shall explain her reasoning in detail and specifically address the more-recent neurological records that diagnose Plaintiff with epilepsy (or seizure disorder) *in addition to* nonepileptic spells.[71]

- If the ALJ again assesses psychogenic, nonepileptic seizures (or a similar condition) as a severe impairment, the ALJ shall supplement the record with testimony from one or more medical experts familiar with psychogenic seizures who can provide information and opinions regarding the related signs, symptoms, and findings.  Additionally, if the ALJ finds Plaintiff suffers from both epileptic seizures and nonepileptic spells, or if the ALJ discounts any evidence on the basis that Plaintiff's seizure-like spells are psychogenic in nature, the ALJ should elicit further medical-expert testimony regarding epileptic seizures, including how they differ from psychogenic seizure-like spells.

- If the ALJ again discounts Plaintiff's symptom reports, the ALJ must articulate specific, clear, and convincing reasons for doing so.[72]  General

---

[71] *See, e.g.*, AR 728, 733, 740, 804.

[72] *Ghanim*, 763 F.3d at 1163.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 23

findings are insufficient because the Court cannot affirm discounting Plaintiff's symptoms for a reason not articulated by the ALJ.[73]

- If the ALJ again relies upon a lack of treatment or conservative treatment as a reason to discount Plaintiff's symptom reports, the ALJ must expressly consider whether Plaintiff's treatment choices are explained by reasons other than his symptoms being less severe than alleged—such as a lack of insurance and/or other barriers to treatment.[74]

## V.    Conclusion

Plaintiff establishes the ALJ erred.  The ALJ is to develop the record and reevaluate—with meaningful articulation and evidentiary support—the sequential process as set forth above.

Accordingly, **IT IS HEREBY ORDERED**:

1.    Plaintiff's Motion for Summary Judgment, **ECF No. 15**, is **GRANTED**.

2.    The Commissioner's Motion for Summary Judgment, **ECF No. 16**, is **DENIED**.

---

[73] *See Garrison*, 759 F.3d at 1010.

[74] *See id.* at 1018 n.24. *See also*, *e.g.*, AR 627, 631 (March 2019: Plaintiff indicating he was having problems with insurance coverage); AR 648, 649 (Nov. 2018: Plaintiff reporting insurance problems and that he "cannot come in monthly for having financial difficulty").

3.      The Clerk's Office shall enter **JUDGMENT** in favor of **Plaintiff**.

4.      The decision of the ALJ is **REVERSED** and this matter is

        **REMANDED** to the Commissioner of Social Security for further

        proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

5.      The case shall be **CLOSED**.

IT IS SO ORDERED. The Clerk's Office is directed to file this order and

provide copies to all counsel.

DATED this 17th  day of March 2023.

_____

EDWARD F. SHEA
Senior United States District Judge

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 25